UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| TANGER MANAGEMENT, LLC; TANGER COLUMBUS, LLC; and TANGER HOUSTON, LLC,<br><br>    Plaintiffs and Counter-Defendants,<br><br>v.<br><br>HAGGAR DIRECT, INC. and HAGGAR CLOTHING CO.,<br><br>Defendants and Counter-Plaintiffs. | CIVIL ACTION NO. 1:20-CV-00874-RP |

### DEFENDANTS AND COUNTER-PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Defendants and Counter-Plaintiffs Haggar Direct, Inc. and Haggar Clothing Co. (collectively "Haggar" or "Defendants") hereby notify the Court of the following legal authority in opposition to Plaintiffs' pending Motion to Dismiss Counterclaims and Strike Affirmative Defenses (Doc. 16.): the April 7, 2021 Opinion and Order in *Bay City Realty, LLC v. Mattress Firm, Inc.*, No. 20-CV-11498, 2021 U.S. Dist. LEXIS 67054 (E.D. Mich. Apr. 7, 2021) (attached hereto as **Exhibit A**.).

In *Bay City Realty, LLC*, a commercial landlord brought claims on April 23, 2020 against a commercial tenant, alleging breach of lease for unpaid rental obligations. *Id.* at *1. In January 2021, the parties filed cross motions for summary judgment. *Id.* at *2. Defendant argued that it had applicable affirmative defenses – frustration of purpose and impracticability – for its refusal to pay rent in April and May during the government ordered shutdown. *Id.* *5, 16.  The court

agreed and granted Defendant's motion for summary judgment, and denied Plaintiff's motion for summary judgment. In doing so, the court held: "The purpose of Plaintiff and Defendant's lease was frustrated by an unforeseeable event not caused by Defendant: the COVID-19 pandemic and Governor Whitmer's Shutdown Order. Further, the pandemic and Shutdown Order were not reasonably foreseeable at the time the contract was signed in 2013," *id*. at *25, and the language of the lease "d[id] not allocate the risk of a government shutdown due to a viral pandemic to Plaintiff or Defendant." *Id*. at *27. Accordingly, the court concluded that "Defendant has asserted a proper affirmative defense to its nonpayment of Base Rent for April and May. . . . Plaintiff shall not seek to recoup April and May 2020 Base Rent from Defendant, nor any related interest or fees. [And], [a]s of June 2020, both parties are obligated to abide by the contract." *Id.* at *30-31.

Dated: April 22, 2021

Respectfully submitted,

BUTLER SNOW LLP

By: */s/ Eric J. R. Nichols*
    Eric J.R. Nichols (State Bar No. 14994900)
    Christopher Cowan (State Bar No. 24084975)
    1400 Lavaca Street, Suite 1000
    Austin, Texas 78701
    Tel.:  737.802.1800
    Fax:  737.802.1801
    Email: eric.nichols@butlersnow.com
    chris.cowan@butlersnow.com

TROUTMAN PEPPER HAMILTON SANDERS LLP

    Jeremy Heep (*pro hac vice*)
    Karli E. Cozen (*pro hac vice*)
    3000 Two Logan Square
    Eighteenth and Arch Streets
    Philadelphia, PA  19103-2799
    Tel.:  215.981.4972
    Fax:  215.981.4750
    Email: Jeremy.Heep@Troutman.com
    Karli.Cozen@Troutman.com

*Attorneys for Haggar Direct, Inc. and Haggar Clothing Co.*

Case 1:20-cv-00874-RP   Document 43   Filed 04/23/21   Page 3 of 16

**CERTIFICATE OF SERVICE**

 I certify that a copy of this Notice will be served on the following by ECF on this 22nd day of April 2021:

Richard L. Fenton
DENTONS US LLP
233 South Wacker Drive. Suite 5900
Chicago, IL 60606
Email: richard.fenton@dentons.com

Uchenna Ekuma-Nkama
DENTONS US LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
Email: uchenna.ekuma-nkama@dentons.com

Lisa C. Fancher
FRITZ, BYRNE, HEAD & GILSTRAP, PLLC
221 West Sixth Street, Suite 960
Austin, Texas 78701
Email: lfancher@fbhg.law

            */s/  Eric J.R. Nichols*
             Eric J.R. Nichols

# EXHIBIT A



# *Bay City Realty, LLC v. Mattress Firm, Inc.*

United States District Court for the Eastern District of Michigan, Northern Division

April 7, 2021, Decided; April 7, 2021, Filed

Case No. 20-CV-11498

**Reporter**
2021 U.S. Dist. LEXIS 67054 *; 2021 WL 1295261

BAY CITY REALTY, LLC, Plaintiff, v. MATTRESS FIRM, INC., Defendant.

**Prior History:** *Bay City Realty LLC v. Mattress Firm, Inc., 2020 U.S. Dist. LEXIS 145213, 2020 WL 4696593 ( E.D. Mich., Aug. 13, 2020)*

## Core Terms

Lease, Lessee, rent, Lessor, leased premises, frustrated, Hazardous, frustration of purpose, Mattress, regulations, shutdown, parties, obligations, covenants, environmental, ordinances, bedding, damages, summary judgment, Contracts, temporary, charges, default, storage, termination, products, monthly, partial, costs, additional rent

**Counsel:** **[*1]** For Bay City Realty LLC, Plaintiff: David A. Breuch, LEAD ATTORNEY, Kevin A. Fanning, Clark Hill PLC, Birmingham, MI.

For Mattress Firm Inc., Defendant: Nicholas J. Tatro, Foley Baron Metzger & Juip, PLLC, Livonia, MI; Richard S. Baron, Foley, Baron,& Metzger, PLLC, Livonia, MI.

**Judges:** Honorable THOMAS L. LUDINGTON, United States District Judge.

**Opinion by:** THOMAS L. LUDINGTON

## Opinion

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AND DISMISSING COMPLAINT**

On April 23, 2020, Plaintiff, Bay City Reality, LLC, filed a complaint alleging that Defendant Mattress Firm, Inc. breached the terms of its lease. ECF No. 1. The case was removed on June 8, 2020. *Id.* On June 29, 2020, Plaintiff filed a motion to remand. In the order denying remand, this Court concluded,

> At the time of removal, Plaintiff claims the past due amount totaled less than $40,000. ECF No. 4. However, as Defendant highlights, in Plaintiff's complaint it lists damages to include "the full amount of all rental obligations due and owing under the Lease . . . [and] the full amount of any other monetary obligations due and owing under the Lease." ECF No. 1 at PageID.15; ECF No. 5 at PageID.73-75. **[*2]** Plaintiff appears to be equivocating between asking for full enforcement of the lease provisions, which include the ability to accelerate future payments and liquidated damages, in its complaint and asking solely for back rent to stay under the $75,000 jurisdictional cap in its motion for remand. Plaintiff cannot seek all damages in its complaint and then argue in its motion for remand that it is only seeking past-due payments.

ECF No. 8 at PageID.93-94. In January 2021, the parties filed cross-motions for summary judgment. ECF Nos. 13, 16. Response and reply briefs were timely filed. ECF Nos. 15, 18, 19, 20, 21.

**I**.

The parties do not contest the underlying facts. ECF No. 20 at PageID.262. Bay City Realty LLC ("BRC") and Mattress Firm entered into a lease agreement in September 2013. ECF No. 13-1. Mattress Firm was obligated to pay BRC a monthly rent ($10,500.50)[1] ("Base Rent") as well as taxes and a share of the Common Area Maintenance costs ("Additional Rent"). *Id.* The current lease expires on February 29, 2024. *Id.* As of March 2020, Mattress Firm had met all of its contractual obligations. ECF No. 16-1 at PageID.204.

On March 11, 2020, the World Health Organization declared that COVID-19, **[*3]** the disease caused by the severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2), had become a pandemic. *Coronavirus Has Become a Pandemic, W.H.O. Says*, NY Times (Mar. 11, 2020), https://www.nytimes.com/2020/03/11/health/coronavirus-pandemic-who.html [https://perma.cc/5HD2-YG9U ]; *Naming the coronavirus diseases (COVID-19) and the virus that causes it*, WHO, https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it [https://perma.cc/2Y72-9UHL ] (last visited Mar. 31, 2021). The CDC recommends wearing a mask, staying six feet apart, avoiding crowds, and receiving a vaccine to reduce the likelihood of contracting COVID-19. *Symptoms*, CDC (Feb. 22, 2021), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html [https://perma.cc/KLK5-H8MB ].

In response to the spread of the virus that causes COVID-19, Governor Whitmer declared a state of emergency on March 10, 2020. ECF No. 16-1 at PageID.236. On March 24, 2020, she issued an Executive Order closing business "not necessary to sustain or protect life" (the "Shutdown Order"). ECF No. 16-1 at PageID.236; ECF No. 16 at PageID.184. **[*4]** Relying upon the authority vested in the Governor by the Emergency Management Act and the Emergency Powers of the Governor Act of 1945, Governor Whitmer "prohibit[ed] in-person work that is not necessary to sustain or protect life." ECF No. 16-1 at PageID.237. She also required all Michigan residents to stay home and prohibited gatherings of people between multiple households. *Id.* ("Subject to the exceptions in section 7, all individuals currently living within the State of Michigan are ordered to stay at home or at their place of residence. Subject to the same exceptions, all public and private gatherings of any number of people occurring among persons not part of a single household are prohibited.") Exceptions to the stay home order were allowed for individuals to care for vulnerable persons, attend emergency legal proceedings, work or volunteer at organizations providing basic necessities, and obtain food and medicine. *Id.*

The Shutdown Order was extended through June 4, 2020. ECF No. 16 at PageID.184. Mattress Firm re-opened to the public on June 6, 2020. ECF No. 16-1 at PageID.205. As a result of the Shutdown Order, Defendant paid the Additional Rent but not Base Rent for the months of April, **[*5]** May, and June. ECF No. 16-1 at PageID.205. Mattress Firm began paying Base Rent again in July 2020. ECF No. 16-1 at PageID.205.

On February 2, 2021, Mattress Firm paid the June Base Rent. ECF No. 18-1 at PageID.249. As such, the question is whether Defendant has an affirmative defense for its refusal to pay the April and May Base Rent.

The relevant portions of the lease are excerpted below,

> **6. Purpose. A**. The Leased Premises are to be used, under this Lease, for the retail sale of bedding products, including mattresses, waterbeds, box springs, foundations, bed frames, headboards, and other related merchandise. In addition, Lessee shall be permitted to use portions of the Leased Premises (i) for storage and office uses incidental to the permitted use, and (ii) subject to any existing exclusive use provision or prohibited use restriction granted to any other tenant or occupant of the Shopping Center, any other lawful retail use (the "Permitted Use"). Notwithstanding anything to the contrary in this Lease, so long as Soldan's and its permitted successors and assigns are operating as a pet supply store in the Shopping Center, Lessee shall not operate as a pet supply store in the Leased Premises. **[*6]**
>
> . . .
>
> **8. Rent. A**. Lessee, in consideration of the leasing of the Leased Premises and the covenants an agreements herein contained, does hereby covenant and agree to and with lessor to pay lessor, as rent for said leased Premises, beginning on the Rent Commencement Date and continuing during the term hereof, in addition to any other sum

---

[1] The monthly rent installment was $9,545.92 for the first five years. ECF No. 13-1 at PageID.134.

herein provided to be paid, without any setoffs or deductions whatsoever, except to the extend otherwise expressly provided herein, a fixed Minimum Annual Rent, payable in equal monthly installments on the first (1st) day of each and every month, in advance, as follows:

[Go to table1](#)

. . .

**9. Late Fee**. Lessee agrees to the following late fee. If rent is **RECEIVED AFTER**:

    The fifth (5th) day of the month: $100.00
    The tenth (10th) day of the month, an additional: $150.00

. . . . **In addition to the** aforesaid late fees, Lessee agrees to pay:

. . .

b) for any indebtedness owed under this Lease on the fifteenth (15th) day of the month interest shall accrue on a per diem basis at the rate of three percent (3%) per month, compounded monthly, until paid **[*7]** in full. Provisions of this Section shall be strictly enforced and shall survive the expiration or termination of the Lease.

. . .

**12. Pay Rent**. **A**. Lessee shall pay to Lessor the rent for said Leased Premises and any and all other charges due under this Lease as herein provided, in lawful money of the United States of America, on the first (1st) day of the month, in advance, without demand and without any deduction, abatement, or set-off whatsoever, at Lessor's address as stated in the Notice Section of this Lease, or at such other place and to such other person, persons, firms, or corporation as Lessor may from time to time direct in writing, and payment pursuant to such instruction shall constitute payment of the Lease rent hereunder. . . . In the event Lessee is late in paying the rent or any other charges due under this Lease on two (2) or more occasions within any twelve (12) month period during the term or any extensions of the term of this Lease, then Lessee shall pay, immediately upon request, an additional administrative fee of Five Hundred Dollars ($500.00) (the "Late Fee"). The Late Fee shall increase by One Hundred Dollars ($100.00) for each subsequent instance Lessee is **[*8]** late in paying rent or any other charges due under this Lease during the same twelve (12) month period. . . .

**C**. Notwithstanding any alleged defense, counterclaim or offset against rent or any other charges due under the Lease, except as otherwise expressly provided in the Lease, Lessee shall continue to pay Lessor all rent and other charges due under the Lease when due, including during the continuance of any dispute or legal action and Lessor shall also fulfill and satisfy all of its obligations under this Lease, despite any dispute that may arise during the term of this Lease. The provisions of this Article shall survive the expiration or termination of the Lease.

**13. Taxes and Insurance**. **A**. Lessee shall pay lessor, as additional rent, Lessee's pro rata share of all Taxes, assessments and insurance paid by lessor.

. . .

**14. Use**. Lessee shall not use or occupy or suffer or permit said Leased Premises or any part thereof to be used in any manner or occupied for any purpose contrary to law or the rules or regulations of any public authority or in any manner deemed a fire hazard or so as to increase the cost of hazard insurance to Lessor over and above the normal cost of such insurance for **[*9]** the type and location of the building of which the Leased Premises are a part and for the intended business of Lessee; provided, however, Lessor represents that the Permitted Use, in and of itself, contravenes Landlord's insurance policies, prevents Lessor from procuring such policies, or causes an increase in any such insurance. Lessee's use of the Leased Premises shall be in compliance with all applicable zoning regulations. Subject to any modifications, alterations or improvements made to the Leased Premises by Lessee, Lessor covenants and represents that the Leased Premises and all parts thereof shall be in substantial compliance with applicable laws, ordinances, and regulations of all federal, state, county, and municipal authorities, including Title III of the Americans With Disabilities Act of 1990 (as same may have been amended), any regulations promulgated thereunder and any similar state or local laws or regulations. . . .

**28. CAM Costs**. **A**. Lessee shall pay Lessor, as additional rent, Lessee's pro rata share of all

Common Area Maintenance expenses ("CAM Costs") as provided herein. Starting on the Rent Commencement Date, Lessee shall pay to Lessor, monthly, in advance, one-twelfth **[*10]** (1/12) of Lessee's pro rata share of the CAM Costs. . . .

**35. Environmental Provisions. A**. As a material inducement to Lessor entering into this Lease, Lessee represents, warrants and covenants that any and all approved Hazardous Materials, as defined herein, or as may be classified or regulated by any and all governmental, statutory or regulatory authority, coming into or used in the Leased Premises, shall be completely contained and shall in no way be dispensed or released into the open air of, into, above, or below the Leased Premises and/or the Shopping Center, or in the sewer system located therein. All Hazardous Materials are prohibited from being in or at the Leased Premises and/or the Shopping Center, unless specifically described herein and approved by Lessor in this subsection, and the use or other handling of the same at the Leased Premises shall be considered an Event of Default under this Lease. Lessee, at its sole cost and expense, shall comply with all laws, statutes, ordinances, rules, regulations and orders of any governmental authority having jurisdiction concerning environmental, health or safety matters, including, but not limited to, any discharge into the air, **[*11]** surface water, sewers, soil, groundwater, or the use, generation, treatment, storage, disposal, or transportation of any Hazardous Material by Lessee, its agents, employees, contractors or invitees, whether written or outside the Leased Premises.

**B**. As used herein, the term "Hazardous Material" means any hazardous or toxic substance, material or waste, which is or becomes regulated by any local governmental authority, the State wherein the Leased premises are located, or the United States Government. The term "Hazardous Material" includes, without limitation, any material or substances which is (i) designated as a "hazardous substances" pursuant to *Section 311* of the Federal Water Pollution Control Act, as amended from time to time (*33 U.S.C. Section 1321*), (ii) defined as a "hazardous waste" pursuant to Section 3004 of the Federal Resource Conversation and Recovery Act, as amended from time to time (*42 U.S.C. Section 6904*), (iii) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation and Liability Act, as amended from time to time (*42 U.S.C. Section 9601*), (iv) petroleum or petroleum derivatives, or (v) fertilizer (liquid or solid).

**C**. Lessee shall indemnify, hold harmless, and defend Lessor against any and all liability **[*12]** claims, causes of action and damages, including Lessor's attorney fees, in connection with Hazardous Materials used or located at the Leased Premises and/or the Shopping Center because of Lessee's business and/or any environmental issues at the Leased Premises caused by Lessee during Lessee's possession of the Leased Premises. Notwithstanding anything to the contrary in this Lease, in no event shall Lessee be liable to Lessor, and in no event shall Lessee's obligations (including without limitation indemnification obligations) under this Lease extend to, environmental, or hazardous conditions of any kind (i) not caused by Lessee or its agents, employees, or contractors, (ii) caused by Lessor or its agents, contractors, or employees or other occupants of the Shopping Center, or (iii) existing on or prior to the date Lessor delivers possession of the Leased Premises to Lessee. The provisions of this Article shall survive the expiration or termination of the Lease.

. . .

**43. Affirmative Covenants of Lessee**. Lessee shall:

**A**. Pay the rent and all other charges herein reserved as rent on the days and time and at the place that the same are made payable, without notice. . . .

**B**. Comply with all **[*13]** requirements of the constituted public authorities, and with the terms of any state or federal statute or local ordinance or regulation applicable to Lessee's use of the Leased Premises, and defend, indemnify and save Lessor harmless from penalties, fines, costs (including reasonable attorney fees) or damages resulting from failure to do so.

. . .

**44. Default**. Any of the following shall be deemed an event of default by Lessee:

**A**. The failure to pay any installments of taxes, common area maintenance, insurance or rent or other charges hereunder when the same become due, time being of the essence of this provision of this Lease, if the failure continues for ten (10) days

after written notice thereof.

**B**. Lessee's failure to perform or observe any other covenant, term or condition of the Lease to be performed or observed by lessee, if the failure continues for thirty (30) days after written notice thereof is given to lessee or such longer period as is reasonably necessary in which to cure such default, in the event such default is not curable within said thirty (30) days period (time being of the essence).

**C**. Lessee shall be late in payment of rent or other charges to be paid hereunder more **[*14]** than two (2) times in any calendar year.

**D**. Lessee abandons, vacates, or ceases to do business in the Leased Premises for ten (10) or more days, except as otherwise provided hereunder.

. . .

**45. Lessor's Remedies**. Upon the occurrence of any event of default, Lessor may, at its option, in addition to any other remedy or right it has hereunder of by law or in equity, without any additional grace period:

. . .

**G**. Lessee shall also pay all costs and reasonable attorney's fees incurred by Lessor in enforcing the covenants, agreements, terms and provisions of this Lease. . . .

**H**. Notwithstanding anything to the contrary contained in this Lease, upon a default by Lessee, (i) Lessor shall take commercially reasonable efforts to mitigate its damages; . . .

**52. Entire Agreement**. This Lease and the exhibits attached hereto constitute the sole and exclusive agreement between the parties with respect to the Lease Premises. . . .

**60. Legal Expenses**. If either party hereto is made or becomes a party to any litigation commenced by or against the other party involving the enforcement of any of the rights and remedies of such party under this Lease, or arising on account of the default of the other party in **[*15]** the performance of such party's obligations hereunder, then the prevailing party in any such litigation, or the party becoming involved in such litigation because of a claim against such other party, as the case may be, shall receive from the other party all costs and reasonable attorneys' fees incurred by such party at trial and on appeal in connection with such litigation.

ECF No. 16-1 (formatting in original).

**II**.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)* (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id. at 251-52*.

**III [*16]** .

Plaintiff asserts one claim: breach of contract. There are three elements to a Michigan breach of contract claim: "(1) there was a contract, (2) the other party breached the contract, and (3) the breach resulted in damages to the party claiming breach." *Bank of Am., N.A. v. First Am. Title Ins. Co., 499 Mich. 74, 878 N.W. 2d 816, 829 (Mich. 2016)*. The parties do not dispute the existence of a contract (the lease), that Defendant breached the contract (by not paying Base Rent for April and May 2020), and that Plaintiff was damaged from the breach (reduced income). However, Defendant asserts two affirmative defenses to the breach: frustration of purpose and impracticability.[2] ECF No. 16.

**A**.

Plaintiff first argues that the lease does not permit Mattress Firm to assert common law defenses, such as

---

[2] Even though Defendant lists these as two separate defenses, it combines the two theories into one argument.

frustration of purpose and impracticability. ECF No. 20 at PageID.267-68. Plaintiff contends that Section 8 eliminates Defendant's ability to assert common law defenses.[3] It also argues that Section 35 "allocates to Mattress Firm the costs and expenses associated with complying with 'all laws, statutes, ordinances, rules, regulationas and orders of any governemntal authority having jurisdiction concerning environmental, health or safety matters.'" ECF No. 13 at PageID.124 (citing ¶ 35 lease).[4] Finally, Plaintiff **[*17]** asserts that "[t]he Lease identifies all events that would trigger an abatement of the Rent or Additional Rent (*see, e.g., id.* at ¶ 36 (permitting abatement of rent during period of repair described therein)), but contains no provision excusing Mattress Firm from paying Rent and Additional Rent under the circumstances present here." ECF No. 13 at PageID.126.

In response, Defendant maintains that "[w]hile the [Section 8] provision prohibits deductions and setoffs from the monthly rent payments, it says nothing about the viability or availability of any substantive defenses to liability that may exist under the law." ECF No. 16 at PageID.199. Defendant further references Sections 6.A and 44.D, stating "[t]he Lease only allows Mattress Firm to use the Leased Premises for the retail sale of bedding products and prohibits any cessation of such use for ten days or more." ECF No. 16 at PageID.197. It explains that Section 35 relates to "environmental hazards" and does not "contemplate[] that the government may bar the only use of the Leased Premises that is authorized in the Lease or allocate[] the risk of that happening to Mattress Firm." ECF No. 16 at PageID.198.

While **[*18]** the parties emphasize various portions of the lease seeking to establish that certain situations are anticipated therein (*e.g.*, environmental hazards, nuisance, condemnation), the threshold question of the availability of common law defenses revolves around Section 8. Section 8 provides, in pertinent part,

**8. <u>Rent</u>. A**. Lessee, in consideration of the leasing of the Leased Premises and the covenants and agreements herein contained, does hereby covenant and agree to and with lessor to pay lessor, as rent for said leased Premises, beginning on the Rent Commencement Date and continuing during the term hereof, in addition to any other sum herein provided to be paid, without any setoffs or deductions whatsoever, except to the extent otherwise expressly provided herein, a fixed Minimum Annual Rent, payable in equal monthly installments on the first (1st) day of each and every month, in advance, as follows: . . .

The phrase "without any setoffs or deductions whatsoever, except to the extent otherwise expressly provided herein" modifies the previous phrase "Lessee . . . does hereby covenant and agree to pay lessor, as rent for said leased Premises . . . in addition to any other sum herein provided to be paid." **[*19]** The first phrase thus provides that any deductions to the Base Rent are limited to those provided in the contract, such as nonpayment of rent when the building is condemned. However, the quoted language itself does not prohibit Defendant from asserting common law defenses to the payment of rent. Further, Plaintiff does not identify any other sections in the lease that prohibit the use of common law defenses in the contract. In fact, the lease specifies that Defendant shall continue to pay rent regardless of any defense, counterclaim or offset.[5] *See* Section 12.C. If all defenses to the payment of rent were identified in the contract, it is unlikely this provision would be necessary. For example, condemnation of property is a legally defined concept and the lease states that BCR bears the risk of loss if the property is condemned. The requirement that rent be paid regardless of any potential defense would be superfluous if all defenses were identified in the contract.

**B**.

The second question is whether the COVID-19 pandemic and Governor Whitmer's shutdown order equates to a frustration of purpose and impracticability defense for Defendant's non-payment of rent. "The primary goal in the construction **[*20]** of a contract is to

---

[3] "Under the Lease, Mattress firm must pay Rent 'without any setoffs or deductions whatsoever, *except to the extent otherwise expressly provided herein*.' (Lease at ¶ 8 (emphasis added)). This unambiguous clause unambiguous [sic] must be enforced as written." ECF No. 20 at PageID.267.

[4] Plaintiff compares this provision with Section 49, which provides that Mattress Firm may terminate the lease if the property is condemned, and Section 33, which requires BCR to bear the burden if Mattress Firm is determined to be a nuisance.

[5] Despite this provision, Defendant chose not to pay April and May 2020 Base Rent, instead of paying rent while also articulating an affirmative defense. Neither party raised this issue in the briefing.

honor the intent of the parties. Where the contractual language is clear, the contract must be enforced as written." Liggett Rest. Grp., Inc. v. City of Pontiac, 260 Mich. App. 127, 676 N.W.2d 633, 638 (Mich. Ct. App. 2003). There are three elements to a Michigan frustration of purpose claim:

> (1) the contract must be at least partially executory; (2) the frustrated party's purpose in making the contract must have been known to both parties when the contract was made; (3) this purpose must have been basically frustrated by an event not reasonably foreseeable at the time the contract was made, the occurrence of which has not been due to the fault of the frustrated party and the risk of which was not assumed by him.

Liggett Rest. Grp., Inc. v. City of Pontiac, 260 Mich. App. 127, 676 N.W.2d 633, 637 (Mich. Ct. App. 2003) (footnote omitted). "As noted in the Second Restatement of Contracts, '[t]he frustration must be so severe that it is not fairly to be regarded as within the risks that he assumed under the contract.' Further, 'the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made.'" Liggett Rest. Grp., Inc. v. City of Pontiac, 260 Mich. App. 127, 676 N.W.2d 633, 637 (Mich. Ct. App. 2003) (footnotes with Second Restatement of Contracts citations omitted). Neither the impracticability defense, nor the frustration of purpose defense can be based "on an argument that the continuation of existing market conditions was a 'basic assumption' **[*21]** on which the contract was made." Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH, 867 F.3d 692, 704 (6th Cir. 2017).

The parties do not dispute that the contract is executory. The parties also agree that one of the purposes of the lease was to sell bedding products. Therefore, the question is whether the circumstances in this case satisfy the third prong; specifically, (1) was the purpose of the lease frustrated by an unforeseeable event (2) not due to Defendant's conduct and (3) not assumed by Defendant?

Defendant argues "there is no question that the principal purpose of both parties in entering into the Lease was for Mattress Firm to be able to use the property to operate a retail bedding store and showroom that is continuously open to the public" and therefore the purpose of the lease was frustrated. ECF No. 16 at PageID.190. Plaintiff counters, "The purpose of the Lease was not entirely frustrated by the Orders [because] Mattress Firm could still use the premises for other purposes, including storage and office uses." ECF No. 20 at PageID.270-71. Plaintiff cites *Mel Frank Tool & Supply v. Di-Chem Co.* in support of its argument that partial frustration of a contract is insufficient for a frustration of purpose defense. However, that case is not applicable. In **[*22]** Mel Frank Tool & Supply, a chemical distributor lessee vacated the premises after an ordinance was passed which prohibited the storage of hazardous chemicals. 580 N.W.2d 802, 803-04 (Iowa 1998). The lessor sued for breach of contract. The lease included a provision requiring the lessee to comply with city ordinances and, at the time the contract was signed, the lessor was unaware that hazardous chemicals may be stored at the facility. *Id.* After reviewing the Second Restatement of Contracts and a previous Iowa case, the Iowa Supreme Court summarized its position,

> A subsequent governmental regulation like a statute or ordinance may prohibit a tenant from legally using the premises for its originally intended purpose. In these circumstances, the tenant's purpose is substantially frustrated thereby relieving the tenant from any further obligation to pay rent. The tenant is not relieved from the obligation to pay rent if there is a serviceable use still available consistent with the use provision in the lease. The fact that the use is less valuable or less profitable or even unprofitable does not mean the tenant's use has been substantially frustrated.

Id. at 808. As a result, the court concluded that because the lessee stored both **[*23]** hazardous and nonhazardous chemicals in the building and it "presented no evidence as to the nature of its inventory and what percentage of the inventory consisted of hazardous chemicals," the lessee failed to establish an impossibility/frustration of purpose defense. *Id.*

In this case, the stated primary purpose of the contract was the retail sale of bedding products. *See* Section 6. The Lease further permits "portions" of the building to be used for "storage and office uses *incidental to the permitted use*" as well as "any other lawful retail use." *Id.* (emphasis added). The storage and office use of the building is predicated upon the main purpose of the lease, the retail sale of bedding products. As for "other lawful retail use," during the shutdown order, no retail use was allowed. Therefore, the only legally permissible use of the building during the shutdown was storage of the bedding products. This is dissimilar to *Mel Frank Tool & Supply* where the lessee could store an unspecified percent of non-hazardous chemicals at the facility, despite the new ordinance. Here, the primary and secondary retail purposes were frustrated by the

Governor's Order. In addition, everyone who could work from [*24] home was required to do so, and, therefore, the offices were essentially storage units for business equipment during the shutdown. The purpose of the lease, the retail sale of bedding products, was substantially frustrated during the shutdown.

The two California cases cited by Defendant support this conclusion. In *Goodman*,[6] government regulations during World War II prohibited the use of lit signs after dark, frustrating the purpose of a lease for the use of a neon sign. The California Superior Court explained that the frustration of purpose defense does not require a defendant to "show that the legal prohibition of the use to which the electrical equipment may be put was complete and that such use was entirely prevented for any purpose permitted under the contract of letting." *Goodman, 149 P.2d at 92*. In fact, the court continued, "[t]he weight of authority in the United States is to the contrary, and is to the effect that such doctrine may be invoked whenever official governmental action prevents the hirer from using the property for the primary and principal purpose for which it was hired." *Id. at 943*. In *Goldschmidt*,[7] a winery tenant was prohibited from using her leased property as an alcohol business during prohibition. [*25] The court found that because the lease limited the use of the property to a winery and liquor establishment, the lease was frustrated.

Further, the two frequently cited Michigan cases regarding frustration of purpose, *Leggitt* and *Molnar*, also support Defendant's assertion. *Leggitt* explains that "the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made." *Liggett Restaurant Group, Inc. v. City of Pontiac, 260 Mich. App. 127, 676 N.W.2d 633, 637-38*. In that case, the contract "explicitly provided for[] the possibility that the Detroit Lions might miss home games in the Silverdome." *Id.* The court found no frustration of purpose because the frustrating event (the Lions not playing at the Silverdome) was not a basic assumption of the contract. Conversely, in *Molnar*, "a property settlement in a divorce case [ ] required the husband to pay partial mortgage payments on the home where his ex-wife and minor son lived." *Id. at 134* (citing *Molnar v. Molnar, 110 Mich. App. 622, 313 N.W.2d 171 (Mich. Ct. App. 1981))*. When the child died prior to his 18th birthday, the Michigan Court of Appeals "held that the father could discontinue" the partial mortgage payments "because they were intended for the minor child's benefit." *Id.* The child's death "fundamentally altered the parties' positions and frustrated the purpose [*26] for which the property settlement as entered." *Id.*

The purpose of Plaintiff and Defendant's lease was frustrated by an unforeseeable event not caused by Defendant: the COVID-19 pandemic and Governor Whitmer's Shutdown Order. Further, the pandemic and Shutdown Order were not reasonably foreseeable at the time the contract was signed in 2013. As such, the next question is whether Mattress Firm assumed the risk of the shutdown orders in the contract.

**C**.

The risk of the frustrated purpose must not be assumed by either party in the contract itself. *See Liggett, 676 N.W.2d at 637*. Plaintiff argues that Section 35 allocates the risk of costs and expenses due to governmental public health and safety regulations to Defendant. ECF No. 13 at PageID.124. In response, Defendant contends that Section 35 focuses on "environmental hazards" and does not "contemplate[] that the government may bar the only use of the Leased Premises that is authorized in the Lease or allocates the risk of that happening to Mattress Firm." ECF No. 16 at PageID.198.

The Michigan Supreme Court provides, "Words should not be construed in the void, but should be read together to harmonize the meaning, giving effect to the [agreement] as a whole." *Thiel v. Goyings, 504 Mich. 484, 939 N.W.2d 152, 160 (Mich. 2019)*. That is, "[t]he other [*27] terms in the list alongside [the term at issue] are contextually important. Under the doctrine of *noscitur a sociis*, a thing is known by the company it keeps." *Id.* In this case, Plaintiff's quoted language, when considered alone, could be interpreted to apply to all governmental health and safety regulations. *See* ECF No. 13 at PageID.124 ("Lessee, at its sole cost and expense, shall comply with all laws, statutes, ordinances, rules, regulations and orders of any governmental authority having jurisdiction concerning environmental, health or safety matters, . . . ." (quoting Lease Section 35)). However, this sentence fragment must be considered in relationship to the entirety of Section 35. Section 35.A requires the Lessee to contain and properly dispose of any "Hazardous Materials." Section 35.B defines Hazardous Materials, and Section 35.C requires Lessee to indemnify Lessor regarding

---

[6] *20th Century Lites, Inc. v. Goodman, 64 Cal. App. 2d Supp. 938, 149 P.2d 88 (Cal. App. Dep't Super. Ct. 1944)*.

[7] *Industrial Development & Land Co. v. Goldschmidt, 56 Cal. App. 507, 206 P. 134 (Cal. Ct. App. 1922)*.

liability claims stemming from a release of Hazardous Materials. This section does not require Lessee to comply with all health and safety regulations, but rather all health and safety regulations relating to Hazardous Materials. As such, this Section does not allocate the risk of a government shutdown due to a viral pandemic to Plaintiff or Defendant.

**D**.

Having **[*28]** concluded that Defendant's use of the space was frustrated by Governor Whitmer's Executive Orders, the question is whether the frustrated purpose terminates the lease entirely or rather simply suspended Mattress Firm's requirement to pay Base Rent. Plaintiff highlights a California case where the court concluded that frustration of purpose results in the automatic termination of the contract. *20th Century Lites, Inc. v. Goodman, 64 Cal. App. 2d Supp. 938, 149 P.2d 88, 93 (Cal. App. Dep't Super. Ct. 1944)*. However, only two paragraphs later in the opinion, the court explained, "The cases where the doctrine of commercial frustration, with its immediate termination of the obligations of the promisor applies, are to be distinguished from that type of case wherein such doctrine is inapplicable and the governmental embargo or regulation is not a permanent prohibition but is temporary only." *Id.* While the court concluded that "commercial frustration" in that instance required automatic termination of the lease, the court recognized the concept of a temporary governmental order that would not result in the permanent cessation of a contract.

The October 2020 update to the Second Restatement of Contracts, originally promulgated in 1981, includes a section specifying that the "[i]mpracticability of **[*29]** performance or frustration of purpose may be only temporary. . . . When the circumstances giving rise to the impracticability or frustration cease to exist, [a party] must then perform." *Restatement (Second) of Contract § 269*, Comment a. Further, case law in Wisconsin and Delaware support the proposition that a temporary frustration of purpose only results in a temporary cessation of performance.

In *Matter of Fuzzy Thurston's Left Guard of Eau Claire, Inc.*, the Bankruptcy court held that a Debtor's obligations to clean and repair a building were partially and temporarily suspended when a storm damaged the building. The Bankruptcy court balanced both the delay caused by the storm as well as Debtor's lackluster efforts to perform prior to the storm when allowing for a partial delay in Debtor's obligation due to frustration of purpose. *Matter of Fuzzy Thurston's Left Guard of Eau Claire, Inc., 6 B.R. 955, 960 (W.D. Wisconsin 1980)* ("Although this balancing of the equities does not support granting the full relief sought by the plaintiff, it cannot disguise the fact that the debtor's compliance with the stipulation was tardy and in some particulars coincided with the trial of this case. The plaintiff cannot be left with the prospect of dilatory performance condoned in the future. Debtor's **[*30]** continued possession of the subject property must, therefore, be conditioned on strict compliance with the terms of the lease as supplemented by the stipulation.").

In *Schaefer Lincoln Mercury, Inc. v. Jump*, the Court of Common Pleas of Delaware, citing the Second Restatement of Contracts, explained that "the temporary frustration of purpose will suspend the obligor's duty to perform while the frustration of purpose exists." *Schaefer Lincoln Mercury, Inc. v. Jump, 1987 Del. C.P. LEXIS 30, 1987 WL 642758, at *2 (Del. Com. Pl. June 8, 1987)*. Defendant's car lease was frustrated due to a lengthy car repair and the court found that "the temporary frustration of purpose is not grounds for canceling the contract, but it will excuse the defendant from making rental payments during the period of time that the purpose of the contract was frustrated." *Id.* Even though no Michigan court has referenced this specific provision of the Second Restatement of Contracts, the Michigan Court of Appeals referenced the Second Restatement of Contracts when it decided that frustration of purpose is a valid contractual defense. *Liggett, 676 N.W.2d at 637*. There is no reason to believe the Michigan courts would not adopt this related provision regarding temporary frustration.

Accordingly, Defendant has asserted a proper affirmative defense to its nonpayment **[*31]** of Base Rent for April and May. Defendant's Motion for Summary Judgment will be granted, and Plaintiff's Motion for Summary Judgment will be denied. Plaintiff shall not seek to recoup April and May 2020 Base Rent from Defendant, nor any related interest or fees. As of June 2020, both parties are obligated to abide by the contract.

**V**.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 16, is **GRANTED**.

It is further **ORDERED** that Plaintiff's Motion for Partial

Summary Judgment, ECF No. 13, is **DENIED**.

It is further **ORDERED** that the Complaint, ECF No. 1, is **DISMISSED WITH PREJUDICE**.

Dated: April 7, 2021

/s/ Thomas L. Ludington

THOMAS L. LUDINGTON

United States District Judge

**Table1 (**_Return to related document text_**)**

|  | Minimum Annual Rent | Monthly Installment | Amount Per Square Foot |
|---|---|---|---|
| Years 1 — 5 | $114,551.04 | $9,545.92 | $9.50 |
| Years 6 — 10 | $126,006.00 | $10,500.50 | $10.45 |

**Table1 (**_Return to related document text_**)**

---

**End of Document**