IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TANGER MANAGEMENT, LLC; TANGER COLUMBUS, LLC; and TANGER HOUSTON, LLC, | § § § § | |
| Plaintiffs / Counter Defendants, | § § § | |
| v. | § § | 1:20-CV-874-RP |
| HAGGAR DIRECT, INC. and HAGGAR CLOTHING CO., | § § § § | |
| Defendants / Counter Plaintiffs. | § § | |

**ORDER**

Before the Court is Plaintiff and Counter Defendants Tanger Management, LLC; Tanger Columbus, LLC; and Tanger Houston, LLC's (together, "Tanger") Motion to Dismiss Counterclaims and Strike Affirmative Defenses. (Dkt. 16). Defendants and Counter Plaintiffs Haggar Direct, Inc. and Haggar Clothing Co., (together, "Haggar"), filed a response, (Dkt. 19), and Tanger filed a reply, (Dkt. 22). Additionally, both parties have filed multiple notices of supplemental authority, (Dkts. 30, 32, 35, 38, 39, 43). Having considered the parties' submissions, the record, and the applicable law, the Court will grant in part and deny the motion to dismiss, and deny the motion to strike.

**I. BACKGROUND**

Tanger, along with other affiliated entities, owns and operates retail properties across the United States, which it leased to Haggar for use as clothing stores. (Compl., Dkt. 1, at 3). Tanger filed this lawsuit on August 24, 2020, alleging that Haggar owed unpaid rent on leases for the

1

months of April, May,[1] and August 2020, asserting a breach of contract based on the leases. (*Id.* at 4–5).

On October 26, 2020, Haggar filed an answer including several affirmative defenses and counterclaims. (Dkt. 7, at 4–27). Haggar alleges that it should not be required to pay the unpaid rent in light of the Covid-19 pandemic's impact on its retail stores. Haggar argues it should be excused from paying rent during the time periods when Tanger "acted to shut its stores in response to the Covid-19 pandemic, prior to Tanger's own decision to close its shopping centers." (*Id.* at 6).

Haggar pleads that it closed all its retail stores in the U.S. and Canada on March 18, 2020. (Answer, Dkt. 7, at 18). Haggar also states that by then, Tanger had "likewise already closed many of the shopping centers," and had closed all of its shopping centers by early April 2020. (*Id.*). In late April, Tanger communicated to Haggar that it intended for stores to reopen beginning May 8, 2020. (*Id.* at 19). Haggar objected that it could not safely open its stores by then. (*Id.*). Haggar did not pay rent for April or May, but resumed payment in June. (*Id.*). Tanger informed Haggar in June 2020 that it was in default for unpaid rent. (*Id.* at 21). Further, in August, as a result of low performance sales that were roughly 50 percent of the sales compared to 2019, Haggar proposed paying only 50 percent of the rental amounts due for August. (*Id.* at 22). Haggar proposed adjusting rent due for the subsequent months based on the same methodology, comparing sales to 2019 levels. (*Id.*).

Haggar now brings a claim for breach of contract based on several aspects of the leases and seeks a declaratory judgment that it does not owe rent for April and May 2020 and may calculate rent as described above for August 2020 and onward. (*Id.* at 24–26). Tanger filed a motion to dismiss each of Haggar's counterclaims under Federal Rule of Civil Procedure 12(b)(6) and to strike Haggar's affirmative defenses under Rule 12(f). (Mot. Dismiss, Dkt. 16).

---

[1] In its counterclaim, Haggar states that it paid "100 percent of the rent for April and May 2020" and is seeking credit for this rent paid. (Answer, Dkt. 7, at 24).

## II. LEGAL STANDARD

Pursuant to Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a 12(b)(6) motion, a "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quoting *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* A court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). A court may also consider documents that a defendant attaches to a motion to dismiss "if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004). But because the court reviews only the well-pleaded facts in the complaint, it may not consider new factual allegations made outside the complaint. *Dorsey,* 540 F.3d at 338. "[A] motion to

3

dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

### III. DISCUSSION

#### A. Force Majeure Clauses

First, Haggar argues that it was excused from paying rent in March, April, and May 2020 under the force majeure clauses in the 25 leases at issue, which it separates into three types, or "buckets." (Answer, Dkt. 7, at 14–16, 24). Under each of these three buckets, Haggar argues that the Covid-19 pandemic was a force majeure event beyond the control of the parties, and that its failure to pay rent "shall not be deemed a default," thereby excusing it from paying rent. (*Id.*).

Tanger argues that even if the Covid-19 pandemic is considered a force majeure event, none of the force majeure clauses excuse Haggar's rent obligations. (Mot. Dismiss, Dkt. 16, at 4). Tanger argues that all the leases state that Haggar's rent obligations are not excused by a force majeure event. (Mot. Dismiss, Dkt. 16, at 10). However, Tanger engages little, if at all, with the text of the force majeure clauses themselves or Haggar's interpretations of the clauses. (*See, e.g.*, Mot. Dismiss, Dkt. 16, at 10) (offering only the conclusory statement that "the force majeure clauses specifically state that Haggar's rent and other monetary obligations are not excused"). For each of the three "buckets," Haggar offers a plausible interpretation and explanation of how the applicable force majeure provision can be read to prevent Haggar from being in default for not paying rent.

#### 1. Bucket One

Eighteen of the leases ("Bucket One") contain a force majeure provision that is similar to the following:

> The failure of either party to perform any obligation under this Lease shall not be deemed to be a default provided such failure is, and continues to be, the result of force majeure. As used herein "force majeure" shall mean any delay which arises from or through strikes, lockouts, labor difficulty, explosion, sabotage, riot, civil commotion, act of war, or other

4

> causes beyond the control of such non-performing party. Notwithstanding the above, (a) Tenant's obligation to make payments due under the Lease or to carry insurance as required by the Lease shall not be construed to be a cause beyond Tenant's reasonable control, and (b) the Term of this Lease shall not be extended by reason of any delay in performance permitted by this Section 44.

(Answer, Dkt. 7, at 14–15). Haggar argues that, according to this clause, its unpaid rent is a failure to perform that "shall not be deemed to be a default" because it is the result of force majeure event, the Covid-19 pandemic. (Resp., Dkt. 19, at 7). Haggar argues that sub-clause (a), which states that Haggar's "obligation to make payments . . . shall not be construed to be a cause beyond [Haggar's] reasonable control," is inapplicable here because Haggar does not claim that its inability to pay rent was the "cause" of the force majeure event, but rather that the Covid-19 pandemic was the cause of Haggar's failure to pay rent. (Answer, Dkt. 7, at 16).

This language is similar to the language analyzed in *In re Hitz Restaurant Group*, 616 B.R. 374 (Bankr. N.D. Ill. June 2, 2020), where a bankruptcy court found that a force majeure clause partially excused the payment of rent because pandemic-related government restrictions limited a restaurant's revenue, and thus ability to pay rent. There, the court found that the phrase "lack of money shall not be grounds for force majeure" did not preclude abatement of rent where the force majeure event was the pandemic related government closure orders, not a lack of money. *Id.* at 378 ("Debtor has not argued that lack of money is the proximate cause of its failure to pay rent. Instead, it is arguing that Governor Pritzker's executive order shutting down all 'on-premises' consumption of food and beverages in Illinois restaurants is the proximate cause of its inability to generate revenue and pay rent."). Like the force majeure clause in *Hitz*, Haggar's plausibly interprets this force majeure clause as excusing its payment of rent.

Tanger challenges the applicability of *Hitz* only in that the force majeure clause in *Hitz* specifically included "governmental action" as a possible force majeure event, unlike here. (Reply, Dkt. 22, at 5); *see Hitz*, 616 B.R. at 377. However, arguing that Covid-19 government restrictions are

not force majeure events contradicts Tanger's implied position elsewhere in its briefing that government-mandated closures qualify as a force majeure event under the leases. (*See* Mot. Dismiss, Dkt. 16, at 18) ("[T]he parties expressly provided for business disruptions caused by force majeure, including restrictive governmental regulations or other unforeseen circumstances."); (Reply, Dkt. 22, at 8) ("The Leases clearly establish that the parties foresaw and provided for business disruptions caused by force majeure events, including restrictive governmental regulations."). The Court is unpersuaded by Tanger's suggestion that the force majeure clause is not applicable to Covid-19 regulations.

Tanger also cites to *In re: CEC Entertainment Inc.*, No. 20-33163, 2020 WL 7356380, (Bankr. S.D. Tex. Dec. 14, 2020), where the court held that "the force majeure clause does not apply to the CEC's obligation to pay rent." (Reply, Dkt. 22, at 4–5). However, there, the court relied on a provision in the force majeure clause that stated: "This Section shall not apply to the inability to pay any sum of money due." *CEC Ent. Inc.*, 2020 WL 7356380354 at 354 ("Rent is a 'sum of money due' under the [lease]. CEC seeks to delay its obligation to pay rent, however, the force majeure clause does not apply to an inability to pay rent."). The provision the court relied on is not analogous to sub-clause (a) in this force majeure clause, which instead states that "[Haggar's] obligation to make payments . . . shall not be construed to be a cause beyond Tenant's reasonable control." In *CEC*, the court did not rely on the provision that stated the force majeure clause did not apply to "a failure to perform caused by a lack of money," *Id.*, which would have been analogous to sub-clause (a) in this case.

Accordingly, Tanger has not provided any analysis or relevant authority that persuades the Court that the force majeure clauses in Bucket One cannot be plausibly read to excuse Haggar from default for unpaid rent in the light of the Covid-19 pandemic and subsequent government regulations.

### 2. Bucket Two

Four leases ("Bucket Two") have a force majeure provision that is similar to the following:

> If Landlord or Tenant is delayed or prevented from performing any of their respective obligations because of strikes, lockouts, labor troubles, inability to procure materials, failure of power, governmental restrictions or reasons of a like nature not the fault of the party delayed in performing such obligation, then the period of such delays shall be deemed added to the time herein provided for the performance of any such obligation and the defaulting party shall not be liable for losses or damages caused by such delays; provided, however, that this Article shall not affect Tenant's obligation to pay rent or any other sums of money hereunder (notwithstanding that the performance of Tenant's Work may be delayed thereby) or any obligation of Landlord or Tenant that can be satisfied by the payment of money, and shall not excuse Tenant from its obligation to continuously operate its business within the Leased Premises in accordance with the provisions of Sections 4.01 and 4.02 hereof.

(Answer, Dkt. 7, at 15). Haggar interprets this clause to mean that Tanger may delay its obligation to provide a retail space, but Haggar must only resume paying rent once Tanger resumes its performance, accounting for the statement that "the period of such delays shall be deemed added to the time herein provided for the performance of any such obligation." (*Id.* at 17). As for the phrase, "this Article shall not affect Tenant's obligation to pay rent," Haggar interprets this to mean it must pay rent only when Tanger's performance is added to the end of the lease, e.g., once Tanger makes the premises available for two extra months at the end of the period currently covered by the lease. (Resp., Dkt. 19, at 9). Tanger does not respond to this interpretation, which the Court finds plausible. (*See generally* Mot. Dismiss, Dkt. 16; Reply, Dkt. 22).

### 3. Bucket Three

The lease for premises at the Hershey Outlet Center in Hershey, Pennsylvania ("Hershey Lease") contains a force majeure clause that states:

> In the event that there is a strike, riot, shortage of material, restrictive governmental regulation, acts of God or other similar cause beyond the control of either party preventing either party from performing under this Lease, it shall not constitute a breach or other violation of this Lease for so long as either party is disabled by such act from performing hereunder. However, nothing contained in this Paragraph 33 shall be construed to relieve TENANT from the timely payment of Base Rent and other charges unless such relief is specifically provided for elsewhere in this Lease.

7

(Answer, Dkt. 7, at 16). The Hershey Lease also includes Section 9(B)(1)(f) that states:

> Notwithstanding anything contained in this Lease to the contrary, if, because of the act, omission or negligence of LANDLORD, its agents, contractors or employees, TENANT is reasonably unable to conduct its business in the Premises for a period in excess of twenty-four (24) consecutive hours, TENANT'S Base Rent and other charges shall abate until such time as LANDLORD shall have corrected the problem causing TENANT not to be able to conduct its business in the Premises.

(*Id.*). Haggar argues that when Tanger closed the shopping centers, it engaged in an "act" that cause Haggar to be "reasonably unable to conduct its business in the Premises," under Section 9(B)(1)(f), abating Haggar's duty to pay rent until the problem was corrected. (*Id.* at 17). The Court finds this interpretation of the force majeure clause to be plausible and Tanger does not address Section 9(B)(1)(f). (*See generally* Mot. Dismiss, Dkt. 16; Reply, Dkt. 22).

Because Haggar offers plausible interpretations of each of the force majeure clauses that would not require the payment of rent due to a force majeure event, and because Tanger does not adequately address the force majeure clauses, the Court will not dismiss Haggar's breach of contract claim based on the force majeure clauses.

### B. Quiet Enjoyment

Next, in its breach of contract claim, Haggar pleads that Tanger breached the covenant of quiet enjoyment when it required the stores to close. (Answer, Dkt. 7, at 24). The leases contain the following covenant of quiet enjoyment:

> Landlord hereby covenants and agrees that if Tenant shall perform all the covenants and agreements herein stipulated to be performed on Tenant's part, Tenant shall at all times during the continuance hereof have the peaceable and quiet enjoyment and possession of the Premises without any manner of hindrance from Landlord or any person or persons lawfully claiming the Premises.

(Mot. Dismiss, Dkt. 16, at 6).

Traditionally, to establish a common law claim for breach of the covenant of quiet enjoyment, a party must show "(1) an intention on the part of the landlord that the tenant shall no longer enjoy the premises; (2) a material act by the landlord that substantially interferes with the

8

tenant's intended use and enjoyment of the premises; (3) an act that permanently deprives the tenant of the use and enjoyment of the premises; and (4) abandonment of the premises by the tenant within a reasonable time after the commission of the act." *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, 241 F. Supp. 3d 737, 753 (N.D. Tex. 2017).

"However, some courts have also allowed this claim to proceed where the tenant has not abandoned the property or stopped paying rent, but the landlord's actions allegedly interfere with the tenant's ability to enjoy the property." *Ogden v. Cozumel, Inc.*, No. 18-CV-358-LY, 2019 WL 2565277, at *3 (W.D. Tex. Feb. 14, 2019), *report and recommendation adopted*, No. 1:18-CV-358-LY, 2019 WL 2565248 (W.D. Tex. Mar. 26, 2019) (citing *Goldman v. Alkek*, 850 S.W.2d 568, 571–72 (Tex. App.—Corpus Christi 1993), *as amended on reh'g* (Mar. 11, 1993)). "The Texas Supreme Court has not yet expressly approved or disapproved of such a quiet enjoyment claim." *Id.*[2]

Regardless of which approach is applied, Haggar argues that it brings a contract claim, not a common law claim, under the lease which specifically prohibits "any manner of hindrance from [Tanger]." (Resp., Dkt. 19, at 11) (citing *Leon's Fine Foods, Inc. v. Merit Inv. Partners, Ltd.*, No. 05-97-00543-CV, 2000 Tex. App. LEXIS 5083, at *10–11 (Tex. App.—Dallas July 31, 2000, pet. denied)) (analyzing both a contractual and common law claim for breach of quiet enjoyment). In light of the precedent supporting a claim for breach of quiet enjoyment where property was not abandoned, *see Ogden*, 2019 WL 2565277, at *3, and the contractual language that broadens the scope of the covenant of quiet enjoyment to include "any manner of hindrance," the Court will not dismiss this claim even though Haggar has not abandoned the premises.

---

[2] Throughout this order, the Court relies on Texas law to address state law claims, as the parties primarily rely on Texas law. Although many of the leases are in other jurisdictions, neither party has established what state law would apply and whether those state laws substantively differ from the outcomes in this order. (*See* Resp., Dkt. 19, at 6 n.1).

9

Under the lease, the covenant of quiet enjoyment only applies if Haggar has complied with all terms and conditions of the lease. (Mot. Dismiss, Dkt. 16, at 6). Tanger argues that the covenant does not apply because Haggar failed to pay rent and failed to reopen its stores in May 2020 despite agreeing to operate stores continuously, amounting to breaches of the terms and conditions. (*Id.*; Reply, Dkt. 22, at 6). However, any potential reopening of stores in May would have occurred *after* Tanger allegedly required Haggar to close its stores in April and May. (Answer, Dkt. 7, at 18). Further, whether Haggar's failure to pay rent was a breach of contract is an unresolved dispute in this lawsuit.

Additionally, Haggar's claim for breach of the covenant of quiet enjoyment seeks damages for "all periods during which Tanger . . . closed stores." (Answer, Dkt. 7, at 24). However, Tanger argues that Haggar closed some stores before Tanger ordered them to close, and that Haggar kept most stores closed after Tanger lifted its restrictions. (Mot. Dismiss, Dkt. 16, at 9–10). Thus, Tanger asserts that Haggar was closed as a result of its own voluntary actions. (Reply, Dkt. 22, at 6). In response, Haggar argues that some of its stores were not closed before Tanger ordered them to close, and there is a factual dispute as to what the cause of each closure was for each store and whether Tanger's order amounted to "any hindrance" with respect to each property. (Resp., Dkt. 19, at 12). The Court agrees that Haggar has plausibly pleaded that at least some properties were closed as result of Tanger's orders, and that discovery can further assist in determining why each property was closed and whether Tanger's orders amounted to breaches of the covenant of quiet enjoyment.

### C. Impracticability and Frustration of Purpose

In its claim for declaratory relief, Haggar seeks a declaration that its performance under the leases should be excused under the common law doctrines of frustration of purpose and impracticability/impossibility. (Answer, Dkt. 7, at 25; Resp., Dkt. 19, at 13). In its counterclaim, Haggar does not specify what performance it seeks to be excused. (*See* Answer, Dkt. 7, at 25)

(seeking broadly a declaration that its "performance under each of Leases was excused"). However, in its response, Haggar clarifies that it "requests a declaration that its rent obligation for this period was excused." (Resp., Dkt. 19, at 13); (*Id.* at 15) ("Haggar alleges it is excused from paying rent because the purpose for which Haggar leased the premises was frustrated and rendered impracticable due to the circumstances of the worldwide pandemic," and "government shutdown orders").

"Texas courts apply the doctrine of commercial impracticability as it is defined in the Restatement (Second) of Contracts, Section 61." *Sherwin Alumina L.P. v. AluChem, Inc.*, 512 F. Supp. 2d 957, 972 (S.D. Tex. 2007). Section 261 of the Restatement (Second) of Contracts states:

> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

RESTATEMENT (SECOND) OF CONTRACTS § 261. "Because courts cannot simply rewrite the parties' contract, the excuse [of impracticability] is limited to circumstances in which both parties held a basic (though unstated) assumption about the contract that proves untrue." *Tractebel Energy Mktg., Inc.*, 118 S.W.3d at 66. "The continuation of existing market conditions and the financial situation of the parties are ordinarily not such assumptions, so that mere market shifts or financial inability do not usually effect discharge under the rule" of impracticability. *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 261, cmt. b.). "Texas courts have held contractual obligations cannot be avoided simply because the obligor's performance has become more economically burdensome than anticipated." *Huffines v. Swor Sand & Gravel Co., Inc.*, 750 S.W.2d 38, 40 (Tex. App.—Fort Worth 1988, no writ); *Alamo Clay Prods., Inc. v. Gunn Tile Co.*, 597 S.W.2d 388, 392 (Tex. App.—San Antonio 1980, writ ref'd n.r.e.) (rejecting defense of impossibility because "[a]t best, the record supports only the conclusion that it would have been economically burdensome to defendant to fulfill its obligations under the contract").

11

Tanger argues that Haggar has not demonstrated that Haggar's performance, paying rent, is "impossible" or "impracticable." (Mot. Dismiss, Dkt. 16, at 13). Haggar argues that it has pleaded impracticability as a result of the "pandemic . . . and the ensuing unprecedented government shutdown orders." (Resp., Dkt. 19, at 15). Haggar argues that it could not comply with the terms of lease, which required stores be open for business for a certain number of days a week, and also satisfy government orders and public health recommendations. (*Id.* at 14–15). While this argument might be persuasive in demonstrating why Haggar should be excused from performance under the leases as to opening the stores, it does not demonstrate why paying rent would have been impracticable, other than because of reduced profits. For instance, in *Centex Corp. v. Dalton*, 840 S.W.2d 952 (Tex. 1992), which Haggar points to as an example of government regulation making payment impracticable, the government regulation at issue specifically prohibited payment of fees to the defendant under the contract. (*Id.* at 953–54). Whereas here, government regulation required Haggar's stores to close, but did not prohibit its rental payments. Because Haggar's payment of rent was not impracticable, despite a decrease in profits from closed stores, the Court dismisses Haggar's request for a declaration that it is rent obligations were excused based on impracticability. *See, e.g.*, *Alamo Clay Prods., Inc.*, 597 S.W.2d at 392.

Haggar similarly seeks a declaration that its performance under the leases was excused because the "principal purpose of the Leases was frustrated" by the closure of its stores and "the nonoccurrence of COVID-19 was a basic assumption on which the Leases were entered." (Answer, Dkt. 7, at 25). Frustration of purpose excuses performance under a contract "when a change in circumstances makes one party's performance virtually worthless to the other, frustrating his purpose in making the contract." RESTATEMENT (SECOND) OF CONTRACTS § 265, cmt. a (1981). "Texas has recognized three contexts in which the excuse may be available: (1) the death or incapacity of a person necessary for performance, (2) the destruction or deterioration of a thing

12

necessary for performance, and (3) a change in the law that prevents a person from performing." *Philips v. McNease*, 467 S.W.3d 688, 696 (Tex. App. 2015). "To be excused under this theory, [plaintiff] had to show supervening circumstances that made his performance impossible." *Id.* In *Philips*, the court denied plaintiff's claim of frustration of purpose where his "economic situation had deteriorated," but there was no "evidence that [plaintiff's] performance has actually become impossible." *Id.* ("John's performance cannot be excused simply because it has become economically burdensome."). Haggar's claim for frustration of purpose fails for the same reason that its impracticability claim fails—it has not pleaded that its payment of rent is impossible. As such, Haggar's claim for frustration of purpose is dismissed.

### D.  Mutual Mistake and Reformation

Haggar additionally seeks a declaratory judgment that the parties were mutually mistaken in their belief that Haggar would be permitted to operate its stores, and therefore the lease should be reformed to terminate upon the interruption of Haggar's use of the premises. (Answer, Dkt. 7, at 26; *see also* Resp., Dkt. 19, at 18 ("[T]he parties intended that malls and shopping centers would be allowed to operate safely.")). "The underlying objective of reformation is to correct a mutual mistake made in preparing a written instrument, so that the instrument truly reflects the original agreement of the parties. Reformation requires two elements: (1) an original agreement and (2) a mutual mistake, made after the original agreement, in reducing the original agreement to writing." *St. Paul Lloyd's Ins. Co. v. Fong Chun Huang*, 808 S.W.2d 524, 527 (Tex. App.—Houston [14th Dist.] 1991, writ denied). Haggar argues that if it is determined that the leases required Haggar to pay rent when the stores were closed, then there was a mutual mistake in drafting the lease language that does not reflect the true intent of the parties. (Resp., Dkt. 19, at 18).

Tanger argues that the parties foresaw potential business disruptions and accounted for them in the force majeure clauses, and therefore there is no mistake in the leases to be corrected. (Mot.

13

Dismiss, Dkt. 16, at 15). However, Haggar has sufficiently alleged that if force majeure clauses are interpreted to require Haggar to pay rent, then there was a mutual mistake in writing the terms of the lease. As such, Haggar's claim does not conflict with the presence of the force majeure clauses in the leases, but is instead an alternative.

Tanger further argues that the parties assumed that the purpose of the leases was to engage in retail sales generally, not necessarily requiring in-person sales. (Reply, Dkt. 22, at 8). However, whether the parties assumed the purpose of the lease excluded in-person sales is a question better suited for discovery. At the motion to dismiss stage, the Court can infer from Haggar's pleadings that the leased stores were intended to be used for in-person sales. Because Haggar has plausibly pleaded that the parties intended the lease to reflect the belief that Haggar would be able to operate the stores, the Court will not dismiss its claim for reformation based on mutual mistake.

### E. Motion to Strike

Tanger also moves to strike Haggar's affirmative defenses. (Mot. Dismiss, Dkt. 16, at 8). A district court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). But striking a pleading is disfavored and should be done sparingly, *Augustus v. Bd. of Pub. Instruction of Escambia Cnty.*, 306 F.2d 862, 868 (5th Cir. 1962), as it is a drastic remedy "and because it is often sought by a movant simply as a dilatory tactic." *Am. S. Ins. Co. v. Buckley*, 748 F. Supp. 2d 610, 626 (E.D. Tex. 2010). Moreover, striking portions of a pleading under Rule 12(f) is appropriate only upon a showing of prejudice to the moving party. *Id.*; *Blount v. Johnson Controls, Inc.*, 328 F.R.D. 146, 149 (S.D. Miss. 2018); *Abene v. Jaybar, LLC*, 802 F. Supp. 2d 716, 723 (E.D. La. 2011). Although Federal Rule of Civil Procedure 8 does not obligate a defendant to set forth detailed factual allegations, a defendant must give the plaintiff "fair notice" of the nature of the defense and the grounds upon which it rests. *Parrish v. Premier*

*Directional Drilling, L.P.*, No. 5:16-CV-417-DAE, 2016 WL 11081902, at *1 (W.D. Tex. Oct. 4, 2016) (citing *Twombly*, 550 U.S. at 553).

Tanger does not argue it will any face prejudice from any of Haggar's affirmative defenses and states that "the issue is not 'notice.'" (Reply, Dkt. 22, at 9). Because Tanger has been sufficiently provided with notice of the affirmative defenses, and because Tanger has not alleged there is any prejudice from the pleaded defenses, the motion to strike is denied without prejudice. If the failure to sufficiently articulate a particular defense later results in unfair surprise, Tanger may then argue that Haggar has waived that defense. *See Lucas v. United States*, 807 F.2d 414, 418 (5th Cir. 1986). If the failure to sufficiently articulate a particular defense later results in prejudice, Tanger may resubmit its motion to strike that defense. *See Malibu Media, LLC v. Doe*, No. 5:19-CV-0834-DAE, 2020 WL 6265345, at *2 (W.D. Tex. Apr. 9, 2020) ("[A]t the pleading stage of the case, it is too early to determine whether these affirmative defenses are valid.").

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that Tanger's Motion to Dismiss Counterclaims, (Dkt. 16), is **GRANTED IN PART** and **DENIED IN PART**. The motion is granted as to Haggar's common law counterclaims for frustration of purpose and impracticability/impossibility, which are **DISMISSED WITHOUT PREJUDICE**. The motion to dismiss is denied in all other respects.

**IT IS FURTHER ORDERED** that Tanger's Motion to Strike Affirmative Defenses, (Dkt. 16), is **DENIED WITHOUT PREJUDICE**.

**SIGNED** on May 11, 2021

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE